# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES HERREN,<br><br>    Petitioner,<br><br>    v.<br><br>MATTHEW CATE, et. al.,<br><br>    Respondents. | Case No.  1:12-cv-01135-AWI-SAB-HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner, represented by counsel, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Fresno County Superior Court one count of second degree murder (Cal. Penal Code § 187) with a gun enhancement (Cal. Penal Code § 12022.53(d)). Petitioner was sentenced to serve a term of forty years to life.

Petitioner timely filed a notice of appeal.  On November 24, 2009, the California Court of Appeal, Fifth Appellate District, affirmed the judgment.  (LD[1] 1).  The California Supreme Court

---

[1] "LD" refers to the documents lodged by Respondent.

1

denied review on February 10, 2010. (LD 6). On January 10, 2011, Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court, which was denied on procedural grounds on March 16, 2011. On April 13, 2011, Petitioner filed an amended petition for writ of habeas corpus in the Fresno County Superior Court. (LD 7). On June 29, 2011, the Fresno County Superior Court denied the petition on the merits. (LD 8). On August 26, 2011, Petitioner filed a habeas petition in the Fifth Appellate District, which denied the petition on December 22, 2011. (LDs 9, 10). On January 26, 2012, Petitioner filed a habeas petition in the California Supreme Court, which denied the petition on May 16, 2012. (LDs 11, 12).

## II.

## STATEMENT OF FACTS

The record from the California Court of Appeal is as follows: [2]

### A. *The Prosecution Case*

On the afternoon of August 29, 2007, appellant shot his daughter-in-law, Chai Xiong, once in the head with a Glock handgun. Chai died from the resulting gunshot wound. At the time of the shooting, Chai lived at appellant's house, with her husband, Jason Herren, and their three-year-old daughter, Keeley.

Around 2:30 p.m., appellant called his sister, Sandra Herren, to come over and pick up Keeley. When Sandra arrived, appellant met her at the front door. Sandra asked appellant what was going on. Appellant told Sandra that when Chai got home from work, she hit Keeley and then sent Keeley to her room because she would not stop crying. After seeing Chai go into Keeley's room, appellant heard Keeley screaming, "papa come help me." Appellant ran into the room and saw Chai with a blanket over Keeley's face. Appellant grabbed Chai but did not know or remember what happened next. When appellant was talking to Sandra, he was crying and upset.

Ron Kent lived across the street from appellant and had come to know appellant very well during the years they were neighbors. Appellant and Keeley appeared to have a very close relationship. They were together most of the time. Appellant told Kent he never knew he could love somebody so much before Keeley came along. Keeley seemed to be appellant's whole world.

---

[2] The Fifth District Court of Appeal's summary of the facts in its November 24, 2009 opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

Around 3:00 p.m. on August 29, 2007, Kent walked out of his garage and saw police officers. Appellant was sitting on his front porch with a towel and a telephone. The police told Kent to get back inside his house. Kent did not know why the police were there. He yelled at appellant that something was going on and that he should get inside his house. The police again told Kent to go back inside his house. Appellant remained on the front porch.

Kent called appellant. Appellant told him, "I just shot Chai." Kent asked if it was accidental, and appellant said no. Appellant told Kent, "Keeley is the reason that I did it." Kent testified that while he was talking to appellant on the phone, appellant sounded "[j]ust a little ... stressed out," but otherwise did not sound different than usual. Kent confirmed that he had never seen any kind of friction between appellant and Chai, nor had he seen Chai act negatively towards Keeley.

Appellant eventually surrendered to the police without incident. A member of the S.W.A.T. team that responded to appellant's house discovered Chai's body in the garage. The body, which was lying face up, was covered by several blankets and articles of clothing.

## *B. The Defense Case*

Appellant was the sole defense witness. Appellant testified that on August 29, 2007, Chai came home from work around 2:00 p.m. Chai told Keeley to change her clothes and that they were going to go visit friends. Keeley got upset and started to cry because she wanted to go swimming.

Chai got angry and spanked Keeley for crying. When Keeley would not stop crying, Chai took Keeley to her bedroom. Appellant followed Chai down the hallway and listened at the door. He could hear Keeley screaming, "Momma, no more." Suddenly, appellant could not hear Keeley, but he could still hear Chai screaming at her to shut up. Then appellant could hear Keeley but "just barely ... like she was a distance away." Appellant opened the door and saw Chai holding a blanket over Keeley's face, smothering her and screaming at her to shut up.
Appellant walked over, grabbed Chai by the hair, and threw her off the bed. He uncovered Keeley's face, picked her up and comforted her. Keeley was crying hysterically. Angry, appellant turned to look at Chai, but she had left the bedroom and was walking down the hallway towards the living room.

After appellant comforted Keeley, he told her, "stay here, papa be right back." Appellant then obtained a gun. He could not specifically remember getting the gun from his closet but that was where he had last placed it. After getting the gun, appellant went down the hallway to look for Chai. Appellant testified that when he was looking for Chai, he was thinking "[t]he abuse, it had to stop" because Chai was going to kill Keeley. Asked when he thought Chai was going to kill Keeley, appellant testified: "She almost was doing it just then, just seconds ago. She was smothering her. You die from being smothered."

Appellant found Chai standing in the kitchen door leading to the garage. Appellant testified: "Then I walked up to her, and she gave me the same look she always gave me, you know, what are you going to do. So I pushed her. I pushed her." Chai fell backwards on the steps of the garage and "kind of bounced off the fender

3

of the car and fell onto the floor of the garage." Appellant walked up to her and shot her once.

Appellant testified that at the time he shot Chai, he was thinking the abuse had to stop and he did not want his granddaughter to die. Appellant thought Keeley would have died if he had not been there that day. Later in his testimony, appellant stated that at the time he shot Chai, there was no doubt in his mind that Chai was going to kill his granddaughter.

Appellant testified that after the shooting, he thought about how he was going to face his son and decided, "I have to use the gun on myself." He did not want Keeley to be there when he did it, so he called his sister to come pick up Keeley. Appellant went in the garage and covered Chai's body with blankets so Keeley would not see her. He then drove with Keeley to the bank to withdraw money for Jason.

When he returned to the house, appellant parked the car outside the garage and went back in the house and wrote a letter to Jason explaining what he had done. Just as he finished the letter, his sister arrived to pick up Keeley. Appellant told her about seeing Chai smothering Keeley, but he could not bring himself to tell her what he had done.

After his sister left, appellant put his letter on the fireplace along with his insurance policy because it paid off on suicide. He then called his older son and left a message telling him goodbye. Afterwards, appellant called Jason and told him what he had done and that Keeley was with his sister. He then called 911 and reported that he had just killed his daughter-in-law.

The recording of the 911 call was played for the jury and admitted into evidence. The transcript of the call reflects that appellant immediately told the 911 operator he just killed his daughter-in-law. The 911 operator began asking appellant a number of questions. At one point, appellant asked, "Don't you want to know why I killed her?" The 911 operator told appellant that the police officer would ask him about that. Appellant responded that he was not going to speak with the police but was going to use the gun on himself when they arrived, "so ask me what you need to know now."

After asking several more questions, the 911 operator asked appellant why he did it. Appellant responded:

"She has been abusing my granddaughter for the last two and a half years. Slapping her. You name it. I don't have time to tell you everything she's done. But she came home in a rage. Made the little girl cry. Spanked her for crying. When she wouldn't stop she took her into her bedroom and I followed her and I listened at the door and she was screaming at the little girl to shut up and I heard the little girl crying. But her cries were like muffled. So I opened the door and she had a blanket over the little girl[']s face with her hand on the blanket smothering her trying to make her shut up. So I grabbed her by the hair and I threw her away. And the cops are here so I gotta go."

Appellant remained on the phone and continued to speak with the 911 operator. Appellant repeated a few times that he had to do it, and that he would not go to jail for something he had to do. Towards the end of the call, appellant told the 911 operator: "I could not wait for her to kill my granddaughter before I did anything. The violence has been escalating for two years now it's been getting worse and

4

worse and I could not wait til she killed her before I did something. Nobody would believe me. My son didn't see it."

Appellant testified that after he spoke to the 911 operator, he spoke to Officer Derik Kumagi on the phone. Appellant told the officer he killed Chai because she had been abusing his granddaughter and he saw her smother the child. He then spoken to a police negotiator for about an hour before he surrendered. Appellant told the police negotiator everything that happened. The police negotiator convinced appellant that he needed to give himself up so he could tell his side of the story and let people know why he did this.

A large portion of appellant's trial testimony described the verbal and physical abuse he claimed to have witnessed Chai inflict on Keeley prior to the shooting. According to appellant, the abuse got worse over time, and when he saw Chai smothering Keeley, he thought it had reached the point where she was going to kill Keeley. Appellant explained: "[Y]ou hear on the news all the time, parents abusing their children for a length of time and then they go a little bit further and kill them. I thought she'd went that step further. I thought she was trying to kill her."

Appellant testified that the first incident of abuse he witnessed occurred when Keeley was around 11 months old. After Keeley spilled her milk, Chai slapped her so hard it "made her little eyes roll." Later, Chai started drugging Keeley by giving her "half a bottle" of Benadryl to make her sleepy. Chai would also throw toys at Keeley. Appellant eventually got rid of all of Keeley's balls because Chai "would pick up the balls and throw them and hit her in the head with them and just had fun making her head bounce."

Appellant further testified that Chai would burn Keeley with hot water when she bathed her. Appellant could hear Keeley screaming and calling, "Papa help me." One time Keeley was burned so badly, "[h]er neck and her shoulders peeled like a sunburn." Chai would also put Keeley, who was afraid of the dark, in a dark closet and keep her in there.

By the time of the shooting, Chai had started disciplining Keeley by biting her fingers and punching her with her fist. She would also tease Keeley about being a baby and would pick her up and then drop her on the floor. According to appellant, by the summer of 2007, such violent treatment had become a daily occurrence and even Jason had begun to notice it.

Appellant testified he never said anything to Chai when he observed the abuse because of an incident in the spring of 2006, during which Chai threatened to move out with Keeley after appellant made a critical comment to Chai, in front of Chai's sister, about her teasing Keeley and making her cry. To prevent Chai from moving out, appellant promised to never interfere again. He felt he could protect Keeley when she lived with him.

After he promised not to interfere again, Chai began flaunting her abusive behavior in front of appellant. Appellant explained, "She would slap her and then look at me, and she would verbally assault her and make her cry and then look at me, or she would spank her." Appellant further testified, "every time she would hurt her from then on, she would look at me like, what are you going to do, and I just had to sit there and take it."

Appellant tried to protect Keeley by bathing her and having her in clean clothes

5

before Chai would return home from work. He also took over feeding Keeley because Chai would get impatient with how slowly Keeley ate. Appellant tried to make sure all these things were done and the house was clean before Chai got home so there would be nothing for Chai to get angry about. According to appellant, Keeley started to reject Chai and ask for appellant to do everything for her. The more Keeley rejected Chai, the angrier Chai would get, which would cause Keeley to reject Chai even more.

Appellant claimed he never reported Chai's abuse of Keeley because he did not think anyone would believe him because Chai, who worked as a correctional officer for the juvenile department, "had a badge." Appellant testified that he discussed this with Jason and they were afraid that if they called law enforcement or child protective services, they would not be believed and that Chai would then leave with Keeley. Appellant explained that Chai had left the house two or three times before when Keeley was a baby. Appellant testified, "She used Keeley as a power over Jason and I. She told us a number of times that I know the power over you is through Keeley."

On cross-examination, appellant admitted that in October 2006, ten months before the shooting, he talked to his son, James, Jr., about killing Chai. Appellant acknowledged telling James that he thought the only way he could save Keeley's life was to kill Chai.

On redirect examination, appellant testified that the evening he made the comment about killing Chai, he had been drinking all day at a family barbeque for James's birthday. During the party, Chai slapped Keeley a couple of times, which shocked everyone in the room. Appellant got angry and walked out into the front yard. James came out and told appellant that he was shocked by what Chai had done and that he had told her that was not how they did things at his house. Appellant then made the comment about killing Chai. Appellant had a beer in his hand when he said it. As soon as he said it, he wished he had not said it. Appellant further testified that he loved Chai and respected her as his son's wife but "hated what she was doing."

### *C. The Prosecution's Rebuttal*

The prosecution called a number of Chai's coworkers and two of Chai's sisters to testify regarding her character for nonviolence and to refute appellant's claims that she was abusive towards Keeley. The prosecution also presented the testimony of an emergency room doctor who examined Keeley on August 30, 2007 (the day after the shooting), and reviewed Keeley's medical records for trial. The doctor found no evidence of trauma or child abuse.

One of Chai's coworkers and friends, Elizabeth Ramirez, testified that on the morning of August 29, 2007, Chai was in a good mood. Chai was looking forward to meeting Ramirez and other staff and their children for a pizza party at 4:00 p.m. Chai got off work around 2:00 p.m. At approximately 2:30 p.m., Chai sent Ramirez a text message. Chai's text message said "they were arguing" and that she would get back to Ramirez later. When Chai did not show up to the pizza party, Ramirez sent Chai another text message and tried calling her, but Chai never responded.

### *D. The Motion for a New Trial*

The jury was instructed on theories of justifiable homicide based on reasonable

6

defense of another (CALCRIM FN4 No. 505) and voluntary manslaughter based on unreasonable or imperfect defense of another (CALCRIM No. 571). After the jury returned a verdict of second degree murder, the defense filed a "Motion for a New Trial, or to Modify the Verdict to Manslaughter: Heat of Passion." In the moving papers, the defense argued the jury was misdirected on the law and the court should have given sua sponte instructions on heat of passion voluntary manslaughter (CALCRIM No. 570) because there was substantial evidence supporting such instructions. Alternatively, the defense argued appellant's conviction should be reduced to voluntary manslaughter. The defense also submitted a declaration executed by appellant's trial counsel, essentially stating that his failure to request instructions on heat of passion was not a tactical decision but an oversight on his part.

After hearing extensive arguments of counsel, the court denied the motion. The court explained its ruling as follows:

"All right. I would like to address some of the early issues raised by defense. And just to make clear where I stand, it appears to me that you are correct that there is no waiver of a right to a jury instruction by failure to request it. It's simply that it is the court's duties irrespective of counsel's request or lack of request.

"As I mentioned, it also appears to the court that there is a testified to provocative act. I am willing to apply a consideration of this without a presumption of correctness and to use the standard suggested by defense counsel....

"As I've already mentioned in a question, but I will state that under the testimony there would, the period of time from the alleged provocation to the period of time of the killing would not be so distant as to preclude an instruction under the heat of passion.

"But in my evaluation of the evidence the only-the evidence showed that there was a calculated decision to kill. And had there [been] different tactics, had there been different evidence it might have been the heat of passion instruction would have been given, but the law does require, as you mentioned, that to warrant an instruction Mr. Herren or the evidence itself must provide some evidence. An instruction must be based on evidence.

"In this particular case if the defendant had not testified, for instance, it might be that the circumstantial evidence, the provocation might have circumstantially led to a conclusion that there was a heat of passion or he might have testified as to something suggesting a passion. But those are might-have-been's or speculation. And in the [instant] case there was, in my opinion, no evidence of passion and thus under the circumstances cannot provide a basis for an instruction.

"I understand that there might have been, there could have been. And in a moment I think you'll see why I feel that way. But the court is not allowed to speculate and is not allowed to make rulings other than on the evidence presented and the evidence presented did not warrant a jury instruction.

"I feel that if a jury instruction had been requested on that that I would have been remiss in giving it because it would have improperly presented a defense and confused the jury and given them an option that was not, that would not be appropriate under those circumstances, under the precise circumstances of this case, which I think are can be differentiated from those under Breverman.

7

> "Motion for a new trial and to reduce the verdict-I would say this too, if the court was to feel that a[n] instructional error was committed I would not reduce the verdict in this particular case because there are many questions as to the truthfulness of the defendant's testimony. So I would have granted a new trial had I chose that remedy.
>
> "Before we go on and in light of this ruling I want to comment as to this, as you folks know there's an old adage in homicide that every killing has a reason even if that reason is illogical or insane there remains a reason for every killing. Here the stated reason for the killing was not supported by the circumstantial evidence and perhaps was not the truth or at least the whole truth.
>
> "The court's feeling there is much more to this story than we have been told. That's one point, but again that's speculation. Maybe that would have, maybe that would have-maybe the whole story would have produced a different set of instructions. I don't feel that we heard that whole story."

(ECF No. 16, Ex. A at 2-11).

## III.

## DISCUSSION

### A.   Standard of Review for a Writ of Habeas Corpus

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior Court, which is located within the venue of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97-98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The AEDPA requires considerable deference to the state courts. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning

from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

**B. Ineffective Assistance of Trial Counsel Claim**

The petition raises several claims of ineffective assistance of trial counsel. Specifically, Petitioner asserts that his trial counsel was ineffective for failing to present evidence to support a heat of passion defense, failing to conduct an investigation of the heat of passion defense and failing to hire an expert. Petitioner also asserts ineffective assistance of counsel for failing to disclose a settlement offer to Petitioner and failing to use exculpatory evidence during the trial.

    1. Standard for ineffective assistance of counsel

The clearly established federal law governing ineffective assistance of counsel claims is

Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 688). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Strickland, 466 U.S. at 669.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Richter, 131 S.Ct. at 787 (internal citation omitted). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697) (holding that a court may dispose of an ineffective assistance of counsel claim on the ground of lack of sufficient prejudice before determining whether counsel's performance was deficient).

In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)

("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

### 2. State court decision

Petitioner presented his ineffective assistance of trial counsel claims in his habeas petition filed in the Fresno County Superior Court on April 13, 2011. (LD 7). On June 29, 2011, Fresno County Superior Court denied Petitioner's habeas petition in a reasoned decision. (LD 8). Petitioner also presented his ineffective assistance of counsel arguments in a habeas petition before the Fifth District Court of Appeal. (LD 9). The Fifth District Court of Appeal denied the petition for writ of habeas corpus without prejudice and commented only on Petitioner's claim that trial counsel failed to adequately communicate a plea offer to him. (LD 10). Petitioner then raised his ineffective assistance of counsel arguments in his petition for review of his habeas petition in the California Supreme Court. (LD 11). The California Supreme Court summarily denied the petition. (LD 12). Federal courts review the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

### 3. Trial counsel's preparation and investigation

Petitioner alleges that his trial counsel was ineffective because he failed to prepare for trial and conduct an adequate pretrial investigation. Specifically, he contends trial counsel failed to prepare Petitioner for cross-examination at trial and never discussed the defense of the case with him. (ECF No. 1 at 12). Petitioner also claims that his counsel did not investigate the facts establishing child abuse which would have supported a heat of passion defense and did not hire a medical and psychiatric expert to support the defense. (ECF No. 1 at 12).

The Fresno County Superior Court denied the claim on the merits as follows:

> However, with regard to petitioner's contention that his attorney should have called witnesses and presented evidence to corroborate his story that the victim was abusing his granddaughter and that he was acting in the heat of passion when he shot the victim, the Court of Appeal has already rejected petitioner's heat of passion argument. (People v. James Lewis Harren 209 Cal. App. Unpub. LEXIS 975.) In his direct appeal, petitioner argued that the trial court erred when it failed to instruct the jury *sua sponte* that it could find that petitioner acted in the heat of passion when he shot

the victim, even though petitioner's counsel had not argued this defense at trial. (Id. at p. 1.) Petitioner also contended that the trial court abused its discretion in denying the motion for new trial based on the failure to give a heat of passion instruction. (Ibid.) The Court of Appeal rejected both arguments, finding that there was no evidence to support a heat of passion instruction, and therefore it was not error for the trial court not to give such an instruction. (Id. at pp. 20-23.)

. . .

Here, the petitioner argues that his trial attorney was ineffective in failing to present more evidence that the victim was abusing his granddaughter, which he claims would have supported his heat of passion defense. Yet the evidence petitioner has submitted to the court would not have helped petitioner to show that he was actually acting in the heat of passion at the time of the murder. At most, the evidence would have shown that the victim was abusing the child, not that petitioner killed the victim in the heat of passion. As the Court of Appeal has already found, there was no evidence that petitioner was acting in the heat of passion, and in fact the evidence showed that petitioner, while provoked, was not so angry or emotional that his reason was obliterated by his anger toward the victim. (Id. at p. 23.) Thus, the trial attorney's failure to present further evidence of abuse did not cause any actual prejudice to petitioner's defense, since such evidence would not have allowed the jury to find that petitioner acted in the heat of passion.

. . .

Petitioner also complains that his attorney only visited him only one time in jail the day before he was to testify, he failed to prepare him for the "rigors of cross examination" and simply told him to tell the truth, the attorney told petition that he did not have time for his case and resented having it assigned to him, he refused to share any possible evidence or available defense with petitioner, he refused to waste taxpayer money on hiring an investigator, and in fact he failed to hire an investigator or consult expert witnesses, he never discussed the defense with petitioner, he only presented a "defense of others" defense at trial, and the attorney admitted in his motion for new trial that he was ineffective in failing to present a heat of passion defense at trial.

However, none of these facts shows that petitioner's counsel acted objectively unreasonably or that his actions caused actual prejudice to his defense. (Strickland v. Washington (1984) 466 U.S. 668, 690-692.) "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (In re Hardy (2007) 41 Cal.4th 977, 1018, citations omitted.) Here, petitioner has not alleged any facts showing that the actions or inactions of his attorney caused any actual prejudice to his defense, or were objectively unreasonable. As discussed above, there was no evidence to support the petitioner's heat of

> passion defense, so it was not unreasonable or prejudicial for his attorney to fail to present evidence or conduct an investigation into the allegations of abuse. Nor was it unreasonable for the attorney to fail to argue the heat of passion defense at trial, since it was not supported by the evidence. Also, petitioner has not alleged any facts showing that his attorney's other actions or inactions caused any actual prejudice to his defense.

(LD 8 at 2-5).

To succeed on a claim of ineffective assistance of counsel based upon a failure to investigate or call a witness, Petitioner must identify the witness in question, and state with specificity what that witness would have testified to, as well as how the witness' testimony might have altered the outcome of the trial. Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003). Petitioner must show that the witness in question was actually available and willing to testify. Id. at 872-73. Generally, this requires submission of affidavits from the witness himself. Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000); see also Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir.), *as amended by* 253 F.3d 1150 (9th Cir. 2001) (mere speculation of possible helpful information from potential witnesses is not sufficient to show ineffective assistance of counsel).

Petitioner claims that trial counsel failed to hire a psychiatric expert to examine Petitioner for psychological disorders and testify as to the lack of intent necessary to support a murder conviction and a medical expert who may have concluded that Petitioner's lack of passion in recollecting the killing was due to post traumatic stress disorder. However, Petitioner does not identify the medical or psychiatric expert, provide any declarations or affidavits from the medical or psychiatric expert, or state what specific evidence the medical or psychiatric expert would have provided had one been hired. Further, Petitioner does not demonstrate that the outcome of the trial would have been different had a medical or psychiatric expert been hired. Therefore, the claim fails.

Petitioner does not state how counsel could have prepared him for cross-examination and how this would have affected the outcome at trial. Petitioner also does not identify what specific evidence his trial counsel could have introduced at trial about Petitioner's emotions and the emotions in the household or how this would have affected the outcome at trial. Any evidence of

15

1  child abuse of Petitioner's granddaughter would not have proven that Petitioner was acting in the
2  heat of passion at the time of the killing.  Both the evidence that was presented at trial and the
3  evidence that Petitioner claims could have been presented at trial only would have shown that
4  Petitioner was trying to protect his granddaughter, and not that he was acting in the heat of
5  passion.  Even Petitioner's testimony at trial supports the theory that he made a calculated
6  decision to kill the victim after witnessing two years of abuse of his granddaughter.  Petitioner
7  admitted on cross-examination that he had a conversation with his son about killing the victim
8  approximately ten months before the murder.

9       Although Petitioner's trial counsel has now admitted that he could have investigated a
10 heat of passion defense further and that he did not even think to argue a heat of passion defense
11 at the time of trial, the state court found that more evidence about the abuse would not have
12 assisted with a heat of passion defense.  The Court finds that the state court's rejection of this
13 claim was neither contrary to, nor an unreasonable application of, clearly established Supreme
14 Court law.  Williams, 529 U.S. at 412-413.  Accordingly, this claim must be denied.

15      4.  Failure to convey settlement offer

16      Petitioner argues that his trial counsel failed to properly convey the terms of a plea offer
17 to Petitioner because he did not tell Petitioner that he could have been exposed to as low as
18 thirteen years imprisonment. (ECF No. 1 at 13).  Petitioner claims that trial counsel would not
19 let him consider the offer of twenty-one years because he would win the case.  (ECF No. 1 at
20 13).

21      A plea of guilty is constitutionally valid only to the extent it is "voluntary" and
22 "intelligent" and must be made with sufficient information of the relevant circumstances and
23 likely consequences resulting from the waiver of certain constitutional rights.  Brady v. United
24 States, 397 U.S. 742, 748 (1970); Boykin v. Alabama, 395 U.S. 238, 242-244 (1969).
25 Voluntariness is determined by looking at the tangible evidence in the record, as determined by
26 the totality of the circumstances surrounding the plea.  Id.  The defendant must make the decision
27 "with the help of counsel, [and] rationally weigh the advantages of going to trial against the
28 advantages of pleading guilty."  Brady v. United States, 397 U.S. at 750.

The decision to reject a plea bargain offer and go to trial is a critical stage of the proceedings. In Hill v. Lockhart, 474 U.S. 52, 56-57 (1985), the Court held that the voluntariness of a guilty plea depends on the adequacy of counsel's legal advice. The first "inquiry is whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Turner v. Calderon, 281 F.3d 851, 879 (9th Cir. 2002). Then the Court must determine whether, "but for counsel's errors, [the defendant] would have pleaded guilty and would not have insisted on going to trial. Id. If the defendant has been informed of the plea offer, the question to determine is whether counsel's "advice was within the range of competence demanded of attorneys in criminal cases. Id. at 880 (quoting McMann v. Richardson, 397 U.S. 759, 772 (1970)). Thus, Petitioner "must demonstrate gross error on the part of counsel[.]" Id. (quoting McMann, 397 U.S. at 771).

In denying Petitioner's habeas petition, the Fifth District Court of Appeal found:

> Insofar as Petitioner claims that trial counsel failed to adequately communicate a plea offer to him, petitioner's declaration is conclusional in that it does not set forth in sufficient detail all of the statements made by trial counsel to petitioner regarding that offer.

(LD 10).

The last reasoned decision on this claim was by the Fresno County Superior Court, which found:

> Also, while petitioner argues that his trial attorney was ineffective in failing to accurately convey the prosecution's offer of a plea bargain for voluntary manslaughter, petitioner has failed to show that his counsel's description of the offer as being for "21 years" was inaccurate. Although petitioner claim that the offer could have resulted in a sentence for as little as 13 years if the judge gave the low term for manslaughter and a 10 year gun enhancement, the actual e-mail offer from the prosecutor stated, "GTP to Penal Code § 192(a) with admission of a Penal Code § 12022.5(a) enhancement. The plea would be straight up meaning there would be an exposure of 21 years in prison." (Exhibit B to Petition.) However, there was nothing in the wording of the offer that indicated that the petitioner would be eligible for a sentence of less than 21 years. Therefore, the petitioner's contention that his counsel failed to accurately convey the prosecution's offer to him is unsupported by the evidence.

(LD 8 at 5).

17

Here, the email from the prosecutor does not state that Petitioner would be eligible for a sentence of less than twenty-one years. The email only says that the "plea would be straight up meaning there would be an exposure of 21 years in prison." (LD 7 at Ex. B). Therefore, there was no clear indication from the email that if Petitioner accepted the plea, he would have been eligible for a sentence less than twenty-one years in prison.

Furthermore, the Court finds credible Petitioner's counsel's statement under penalty of perjury in response to the Fifth District Court of Appeal's request for Petitioner's counsel to reply to Petitioner's allegations in the habeas petition. Petitioner's counsel stated that he did tell Petitioner that there was a twenty-one year plea offer for voluntary manslaughter with a gun enhancement and that the maximum exposure was twenty-one years and the minimum exposure was six years. (LD 11 at G-1). Petitioner's trial counsel also stated that Petitioner was not interested in resolving the case in this manner and he agreed with this decision. (LD 11 at G-2).

Therefore, after Petitioner was advised that he could have received a prison sentence as low as six years, he decided to reject the plea deal. Contrary to Petitioner's claims, Petitioner made the decision to reject the plea deal after his trial counsel presented the deal to him and explained the exposures that Petitioner faced. Petitioner claims that his counsel told him that he could win, which the Court notes is not a legal impossibility. Petitioner does not allege that his trial counsel advised him that he could not be convicted at trial. Therefore, Petitioner has not shown that his counsel failed to adequately convey a plea offer to him. Thus, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Williams, 529 U.S. at 412-413.

5. Counsel ignoring exculpatory evidence

Petitioner argues that this trial counsel ignored evidence that Petitioner's son, Jason, could have corroborated claims about the abuse of Petitioner's granddaughter and could have supported a heat of passion defense. Petitioner points to the District Attorney's investigate report of an interview with Jason, the prosecutor's email about the plea offer, and text messages

allegedly exchanged between the victim and Jason.[3]

"[T]he test for prejudice is whether the noninvestigated evidence was powerful enough to establish a probability that a reasonable attorney would decide to present it and a probability that such presentation might undermine the jury verdict." Mickey v. Ayers, 606 F.3d 1223, 1236-1237 (9th Cir. 2010). Petitioner has failed to demonstrate that, had this evidence been presented at trial, there is a reasonable probability he would not have been convicted.

Petitioner presents nothing more than his speculation that his son's statements about the abuse. Petitioner has not presented any evidence that his son was willing to testify at trial and what that testimony would have been. Jason made statements to the investigator that could have actually hurt Petitioner's defense. The text messages reveal marital problems between Jason and the victim. It is possible that the jury could have determined that Petitioner committed the killing because of a concern that his son and the victim's marital problems could have caused the victim to leave with his granddaughter. Although Petitioner claims that Deputy District Attorney Gunderson's email about the plea offer shows the willingness to declare the evidence insufficient to prove murder, the email was only Deputy District Attorney Gunderson's opinion that there was some evidence corroborating Petitioner's belief that he felt he had to act in defense of his granddaughter. Therefore, Petitioner has not shown that his counsel's decision not to call Jason was an unreasonable decision or that Petitioner suffered prejudice. Accordingly, the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Williams, 529 U.S. at 412-413.

## IV.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED. This Findings and Recommendation is submitted to the assigned United

---

[3] Respondent points out that the copies of the text messages between Jason and the victim were not presented to the state court. Upon a review of the state court record, the Court finds that not all of these text messages were presented to the state court. The Court notes that some of the text messages were presented to the state court. Review under 2254 is limited to the record that was before the state court that adjudicated the claim on the merits. Pinholster v. Cullen, 131 S.Ct. 1388, 1398(2011).

States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 30, 2015**

UNITED STATES MAGISTRATE JUDGE